**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

VEOLIA ES SPECIAL SERVICES, INC.,
(f/k/a Onyx Special Services, Inc.,)

                    Plaintiff,

v.                                                    CIVIL  ACTION  NO.  3:07-0153

HILTOP INVESTMENTS INC., et al.,

                    Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending are numerous motions filed by the parties.  On February 23, 2010, the Court heard

argument and evidence on issues relevant to several of those motions.  After considering the material

presented at that hearing, and further argument presented in briefs, the Court has concluded: 1) that

the *pro tanto* method is superior for settlement credit on the facts of this case; 2) that the proposed

settlement between Plaintiff and Defendant Marathon Petroleum Company is fair and was reached

in good faith; and, 3) that the disputed $205,000 in costs incurred by Veolia for transportation and

disposal is recoverable.

As a result of these decisions the following motions have been resolved: (Doc. 279)

GATX's Motion for Partial Summary Judgment Against Defendant Marathon is **DENIED** as moot;

(Doc. 306) GATX's Motion *in Limine* with Respect to Application of CERCLA Settlement Credit

Rules is **DENIED**; (Doc. 327) Defendant Marathon Petroleum Company LLC's Motion to Dismiss

is **GRANTED;** (Doc. 367) Defendant Marathon Petroleum Company LLC's Motion for Protective

Order is **DENIED** as moot; (Doc. 369) Defendant GATX Corporation's Motion to Compel

Marathon to Respond to Discovery requests is **DENIED** as moot; and, (Doc. 359) Defendant GATX"s Motion for Summary Judgment is **DENIED in part.**

## Background

### I.     Description of the Spill and Cleanup

The material facts giving rise to this litigation are not in dispute and are well known to all those involved in the case.  At the relevant time period, Marathon Petroleum Co. LLC ("Marathon") had leased a number of railroad tank cars from GATX Corporation ("GATX").  It planned to use one of these tank cars – GATX 71782 ("Tank Car") – to transport Coal Tar Light Oil ("CTLO") from Sloss Industries Corporation's ("Sloss's") Birmingham, Alabama, facility to Marathon's refinery in Catlettsburg, Kentucky.

On October 12, 2004, Sloss loaded the car with CTLO.  Marathon had taken its tank car unloading facility offline for repairs and so directed railroad companies to transport the Tank Car to Techsol Chemical Company's Westmoreland, West Virginia, transloading facility.  The plan was to transfer the CTLO from the Tank Car to trucks, which would then complete the journey to Marathon's refinery. Unfortunately, this Tank Car to truck transfer never occurred.

The Tank Car is of a type known as a "general purpose non-pressure tank car."  As is typical of such cars, the Tank Car is equipped with a top-operated, bottom-opening valve ("Valve").  As the name indicates, while the Valve is operated from an assembly on the top of the car, the opening itself is located on the bottom of the car.  This bottom opening is covered by an external cap equipped with a small secondary valve.  It appears from the evidence that the primary Valve was stuck in an open position during the planned transfer by Techsol.  Although Techsol workmen likely attempted to close the Valve from the top of the car, it remained stuck.  When they removed the

bottom cap, the CTLO gushed from the car onto the ground.  The workmen were not able to close the Valve and the entire contents of the tank car, some 22,000 gallons, spilled.

Exacerbating the problem of the spill was the fact that Techsol did not have the proper, and legally required, secondary containment systems.  As a result, much of the CTLO flowed off of the Tecshol property, into a drainage ditch, through a storm sewer and into Krout's Creek.  It is undisputed that at least some employees of Marathon knew about the lack of a secondary containment system at Techsol at the time it retained Techsol for transloading operations and at the time of the spill.

The morning of the spill someone from Techsol contacted Veolia Es Special Services ("Veolia") to request its support in responding to the spill.  Veolia arrived on site at approximately 9:00 a.m. that day.  Before initiating cleanup Veolia inquired whether Techsol was insured to cover the cost; Veolia received assurances that Techsol was.  During the first four days of its efforts, from October 28, 2004 through November 2, 2004, Veolia took several steps to remediate the spill.  It flushed the impacted ditch with water and then vacuumed CTLO and water from behind a dam in Krout's Creek, constructed to impede the flow of the spill.  Veolia placed this material into FRAC tanks for temporary storage and then removed impacted vegetation and soil from the bed of Krout's Creek.  In the midst of this work, sometime on the date of November 2, 2004, Veolia learned that Techsol did not have insurance and would not be able to pay for Veolia's services.  Veolia planned to pull out from the site at 4:30 p.m that day.

To prevent Veolia from leaving, Marathon assumed financial responsibility for the cleanup. Veolia continued working for several days and received payment in the amount of $2.7 million from Marathon.  It did not receive any payment for the work performed from October 28, 2004 until 4:30

p.m. November 2, 2004.  It now claims $640,127.59 in damages from the remaining defendants in this suit in an attempt to recoup payment for work performed during that time period.  Included in this $640,127.59 is a disputed amount of $204,586.83 and some unknown margin of profit.

## II.    Remaining Parties' Roles and Responsibilities

In an attempt to recover for its unpaid work, Veolia filed this case (originally in the United States District Court for the Eastern District of Kentucky) against several parties with a connection to the Tank Car or the Techsol property.  The most obvious defendant, Techsol, has never made an appearance before this Court and has been terminated as a result of default judgment.  Techsol, however, is insolvent and so the likelihood of meaningful recovery against it is slim.  Hiltop Investments, Inc. ("Hiltop") was made a party as a result of its ownership of the spill site, which it leased to Techsol.  GATX was made a party as a result of its ownership of the Tank Car.  Marathon not only owned the CTLO which spilled, but also managed its transport.  Rescar, Inc. was made a party as a result of its role in a Tank Car inspection, prior to the loading of CTLO.  Sloss sold the CTLO to Marathon and loaded the product into the Tank Car before it was transferred.

Although this Court has made no finding as to relative culpability amongst the defendants, a related case in the Circuit Court of Wayne County, West Virginia did result in the apportionment of fault among many of the parties here.  *See John Adkins, et al. v. Techsol Chemical Company, et al.*, No. 04-C-261 (Circuit Court of Wayne County, West Virginia).  A group of individuals who were evacuated from their homes as a result of the spill filed suit against Marathon, Techsol, Sloss, Rescar and GATX.  Hiltop was not included within the filing.  As part of the action, Marathon asserted state law cross-claims against its co-defendants in an attempt to recover money it spent in cleanup of the site.  In late 2006, GATX reached a negotiated settlement agreement with the *John*

*Adkins* plaintiffs, and shortly thereafter Marathon agreed to dismiss its cost-recovery claims against GATX.  As part of the settlement agreement GATX and Marathon also reciprocally agreed not to pursue contribution cross-claims against one another in this case if one of them settled in good faith with Veolia.  As a result of this agreement, GATX dropped out of the *John Adkins* lawsuit.  In May 2009, the remaining *John Adkins* defendants, Marathon, Sloss, and Rescar, participated in a trial in Wayne County Circuit Court on Marathon's cross-claims for recovery of response costs.  The jury assigned liability amongst the parties:  Marathon, 60%; Techsol, 30%; Rescar, 10%; and Sloss, 0%.

## III. Marathon's Settlement with Veolia

Several months after the verdict in *John Adkins*, on September 28, 2009, Marathon entered into a settlement agreement with Veolia.  Under the terms of the agreement Veolia will drop its claims against Marathon in exchange for a $200,000 "Settlement Amount."  The agreement further states that Marathon can receive a credit towards this Settlement Amount based on work it awards Veolia in the future.  For every $100,000 of "certain storage tank related services" awarded to Veolia, Marathon will receive credit for $15,000 towards the Settlement Amount.  While the agreement will not guarantee Veolia any new work, the agreement does specify that "Marathon Transportation & Logistics Organization [will] adopt and ratify Marathon Refining Organization's existing internal approval of Veolia as candidate storage tank service provider, thus allowing Veolia to compete for such storage tank work on an equal footing with all other candidate service providers."  Settlement Agreement and Release (Doc. 328 Attach. 2).  The agreement also specifies that Veolia will continue to compete on an equal footing with other candidate providers for emergency response services work.  The agreement does not indicate that any credit towards the

Settlement Amount would be given for this type of work.  If the amount of credit does not equal $200,000 at the end of three years, Marathon is obliged to pay the remaining balance in cash.

GATX, Sloss, and Rescar argue that by the terms and the context surrounding the agreement, it was unfairly entered into by Veolia and Marathon.   GATX, Sloss, and Rescar assert that Marathon flexed its financial muscle, and leveraged its business relationship with Veolia in order to strong arm Veolia into an unfavorable settlement.  These defendants complain most loudly that the settlement agreement is unfair to the remaining parties because it allows Marathon – likely the most culpable party – to withdraw from the case for a minimal amount while other – likely far less culpable parties – may be left on the hook to cover the remainder of Veolia's damages.  For its part, Veolia claims that its settlement agreement with Marathon is fair and urges the Court to adopt it.

### Discussion

There are several motions now pending before this Court and, as a result, numerous issues to be addressed.  This opinion will not attempt to dispose of all of them, but it will resolve the following issues: 1) the procedure for credit of Marathon's settlement with Veolia; 2) the fairness of Marathon's settlement with Veolia; 3) the inclusion of approximately $205,000 in Veolia's claimed damages.

### I.    The Court Will Apply the Pro Tanto Method of Credit to the Settlement Between Veolia and Marathon.

Veolia has asserted claims against the defendants under § 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C § 9607.  Through this provision, certain "covered persons," also known as Potentially Responsible Parties ("PRPs"), are liable for "any . . . necessary costs of response incurred by any . . . person consistent

with the national contingency plan."[1]  The distribution of these costs among covered parties is addressed in a separate section, 113.  *See* 42 U.S.C. § 9613.  The effect of settlement by one PRP with a private party plaintiff, such as Veolia, is not directly addressed.  *Id.*  Rather, the statute simply provides, "the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."  *Id.* at § 9613(f)(1).  A separate provision does address the effect of settlement when it is the United States or State is the plaintiff seeking response costs.  *Id.* at § 9613(f)(2).  In such an instance settlement "reduces the potential liability of the others [liable parties] by the amount of settlement."  *Id.*

Without clear guidance from the statue, the Court is left to choose among various ways to credit the settlement between Marathon and Veolia.  The Supreme Court in *McDermott, Inc. v. AmClyde*, 511 U.S. 202 (1994) analyzed various forms of settlement credit in the context of an admiralty case.  The Court began by noting that the American Law Institute (ALI) has identified three principal alternatives to credit settlement amounts when the plaintiff settles with one of several joint tortfeasors.  *Id.* at 208 (citing Restatement (Second) of Torts § 886A).  These three methods include two types of "*pro tanto*" settlement distribution – where the amount credited is equivalent to the settlement amount – and a "proportionate" settlement distribution – where the amount credited is proportionate to the settling defendant's fault.  *Id.* at 208-09.  The difference between the two *pro tanto* rules is that one allows cross-claims for contribution amongst the severally liable defendants

---

[1]The second ellipse in this sentence masks the word "other" so that the quote more fully indicates that response costs are recoverable from "covered persons" by "any other person."  42 U.S.C. § 9607(a).  There was debate for some time about the meaning of "other" and whether it referred only the United States (referenced in separate sections) or was meant to preclude covered persons from taking advantage of § 9607.  In 2007 the Supreme Court determined that "other" meant other than the United States and that covered persons could take advantage of § 9607 if they incurred response costs.  *See United States v. Atlantic Research Corp.*, 551 U.S. 128 (2007).

to stand, while the other disposes of them. *Id.* The Court quickly eliminated the possibility of applying a *pro tanto* approach with allowed contribution, because it assumed it would all but eradicate incentives to settle. *Id.* at 211-12. The Court then went on to discuss the various advantages and disadvantages of the *pro tanto* approach without contribution and the proportionate approach.

The Court reasoned that under the *pro tanto* approach the settling defendant's monetary share, "is likely to be significantly less than the settling defendant's equitable share of the loss" and therefore was likely to lead to inequitable settlement distributions among defendants. *Id* at 212-13. The Court then noted that this disadvantage, of inequitable distribution, could have advantageous component – it would add extra incentive for defendants to settle. *Id.* at 214-15. In the context of the case, however, the Court found this extra incentive to settle outweighed by the potential inequity and concluded that there would be reasonable incentive to settle under the proportionate rule as well for the more traditional benefits of saving litigation costs. *Id.*    In the end it did not find one approach significantly more advantageous in promoting settlement. *Id.*

Analyzing the effect on judicial economy, the Court also found the relative advantages of the two rules "ambiguous." *Id.* at 216. While the *pro tanto* rule might avoid the determination of fault of the settling defendant at trial, it requires a fairness hearing before contribution claims can be dismissed. *Id.* at 216-17. The proportionate rule has the advantage of postponing the assignment of liability until trial, which might ultimately be avoided if all parties settle. Additionally, evidence as to the fault of a settling party would likely come up in trial even with the use of the *pro tanto* rule because parties would want to explain the full context of the controversy and other defendants would make arguments of fault about the "empty chair" hoping to show that the settling defendant was

"exclusively responsible for the damage." *Id.* In the end, as with its discussion of settlement, the Court could not determine a clear advantage on judicial economy of one form of settlement distribution over another.

Without finding a clear advantage or disadvantage of either method in terms of promotion of settlement or judicial economy, the Court turned to its prior decisions in the context of admiralty to determine if precedent would favor one form over the other. It concluded that the proportionate rule was more consistent with its prior decision in *United States v. Reliable Transfer Co., Inc.* 421 U.S. 397 (1975). *Id.* at 219 ("In sum, although the arguments for the two approaches are closely matched, we are persuaded that the proportionate share approach is superior, especially in its consistency with *Reliable Transfer*."). *Reliable Transfer* was a landmark case in admiralty law which changed the apportionment of damages when an accident occurred at sea. *See generally*, 421 U.S. 397. The old rule was that damages were simply divided equally, without regard to fault. *Id.* The Court did away with this rule, holding

> that when two or more parties have contributed by their fault to cause property damage in a maritime collision or standing, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault.

*Id.* at 411. It would thus have been contrary to the admiralty law policies established in *Reliable Transfer* for the *McDermott* Court to adopt a settlement contribution scheme which allowed an inequitable distribution of damages compared to relative culpability.

Recognizing that the *McDermott* decision relied heavily on the context of fault-based apportionment for joint tortfeasors in admiralty, established by the holding of *Reliable Transfer*, several courts – including the Fourth Circuit Court of Appeals – have distinguished *McDermott* and found it inapplicable in other contexts.  *See e.g. Chisholm v. UHP Projects Inc.,* 205 F.3d 731 (4th Cir. 2000); *Akzo Nobel Coatings, Inc. v. Aigner Corp.,* 197 F.3d 302 (7th Cir. 1999); *Am. Cyanamid Co. v. Capuano,* 381 F.3d 6 (1st Cir. 2004).   In *Chisholm*, the Fourth Circuit found that the *McDermott* approach would not be applicable – even under admiralty law – when defendants held duties towards the plaintiff that imposed strict liability without regard to fault.  *Chisholm*, 205 F.3d at 735, 739.  *Akzo Nobel Coatings* and *Am. Cyanamid* both distinguished *McDermott* in the context of CERCLA, and chose to adopt a *pro tanto* rather than proportionate approach to the distribution of credit from a settling defendant.

Considering the policies embodied in CERCLA and the relevant effects on promotion of settlement and judicial economy presented in the type of case before this Court, the Court must side with the authorities finding *McDermott* inapplicable.  The *pro tanto* approach is the better approach to settlement credit on the present facts.  First and foremost, liability under CERCLA to a § 9607 plaintiff is not determined by fault; rather, CERCLA creates a status based strict liability scheme.  *See* 42 U.S.C. § 9607; *United States v. Monsanto Co.,* 858 F.2d 160, 167 & n.11 (4th Cir. 1988) ("[T]he overwhelming body of precedent . . . has interpreted [CERCLA] as establishing a strict liability scheme.")  Any PRP can be held liable for necessary response costs incurred during cleanup, based not on their culpability but by fitting within a category of covered persons defined within the statute.  *Id.*  It cannot be denied that CERCLA provides a mechanism for shifting financial responsibility based on considerations of culpability, *see* 42 U.S.C. § 9613(f), but this mechanism

comes into play only after a PRP defendant has been subject to liability from a non-PRP plaintiff. *United States v. Atlantic Research Corp.* 551 U.S. 128 (2007). Apportionment based on fault, therefore, is not the principle consideration in this type of CERCLA action, as it was in *McDermott.* As the Fourth Circuit found in *Chisholm,* the presence of strict liability changes the nature of a lawsuit distinctly from that which was presented to the Supreme Court in *McDermott.* While the Court in *McDermott* had to pay heed to the policy of fault based apportionment articulated in *Reliable Transfer*, this Court must consider the wholly different policy values Congress chose to implement through CERCLA's strict liability scheme – the prompt and effective cleanup of the nation's hazardous waste sites. *See Westfarm Assocs Ltd. P'ship* 66 F.3d 669, 677 (4th Cir. 1995); *S.C. Dept. of Health and Env't Control v. Commerce and Indus. Ins.,* 372 F.3d 245 (4th Cir. 2004).

The *pro tanto* approach best furthers CERCLA's primary goal of promoting prompt and effective cleanups by assuring that the private-party § 9607 plaintiff will not be shortchanged in their attempt to recover cleanup costs. Because the plaintiff knows the precise amount their settlement will be worth and the rest of the response costs will be recoverable from other PRP's held strictly liable under the statue, the plaintiff can be virtually assured of complete recovery. By contrast, under the proportionate approach, the private party who conducted cleanup is likely to be left holding the proverbial bag if they inaccurately forecast the relative culpability of a settling defendant. *See Action Mfg. Co., Inc. v. Simon Wrecking Co.* 428 F.Supp.2d 288 (E.D. Pa. 2006). Since a non-PRP private party who conducts CERCLA related cleanup already faces the hurdle and expense of pursuing litigation to receive compensation for its response costs, the prospect of less than full recovery would add an additional disincentive to private party cleanups and would therefore be contrary to CERCLA's principle goals. While this approach may at times lead to non-

-11-

settling defendants bearing a greater share of the costs irrespective of their fault, defendants who are truly unconnected to the cause of the spill or release are still protected by affirmative third-party defenses articulated in 42 U.S.C. § 9607(b). This provision relieves a PRP defendant from *all* liability if they can show that the release was caused solely by either, 1) "an act of God"; 2) "an act or war" or 3) an act or omission of a third party, other than one "whose act or omission occurs in connection with a contractual relationship." These defenses eliminate the possibility of the grossest inequities.

As several courts have found, the promotion of settlement early in the proceedings, though favorable in all litigation, takes on special importance in the context of CERCLA. *B.F. Goodrich v. Betkoski* 99 F.3d 505, 527 (2d Cir. 1996) ("Courts considering CERCLA cases have recognized that the usual federal policy favoring settlements is even stronger in the CERCLA context.") *abrogated on other grounds by United States v. Bestfoods*, 524 U.S. 51 (1998); *United States v. DiBiase* 45 F.3d 541, 545 (1st Cir. 1995); *United States v. Fort James Operating Co.*, 313 F.Supp.2d 902, 911 (E.D. Wis. 2004) ("Settlements in CERCLA cases promote one of CERCLA's primary goals – expeditious remediation."). While the *McDermott* Court disfavored the inequitable apportionment that might occur when settlement proceeds were distributed *pro tanto*, it also recognized that this same inequitable apportionment would be an added incentive for settlement. 511 U.S. at 214-15. The proportionate rule would discourage settlement by making plaintiff bear the risk that the settlement adequately reflected the settlor's share of fault. Where there are several PRPs, like this case, the proportionate approach encourages defendants to hold out until a fault-based allocation can be made, requiring the plaintiff to continuing litigating and thereby reduce its net recovery. In enacting 1986 amendments to CERCLA Congress explicitly created a scheme that

forces PRPs to bear a high risk of disproportionate liability when they refuse to settle with the United States, or a State that has incurred cleanup cost – through the express adoption of *pro rata* apportionment without the possibility of contribution.  42 U.S.C. § 9613(f)(2); *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 91 (1st Cir. 1990).  "This can prove to be a substantial benefit to settling PRPs –  and a corresponding detriment to their more recalcitrant counterparts," and thus simultaneously uses both a carrot and a stick to promote early settlement.  *Cannons Eng'g Corp*. 899 F.2d at 91.  Here, Veolia, a party unconnected with the spill except for its role in cleanup, stands in a similar position to as a governmental entity initiating and taking responsibility for cleanup. Adoption of the *pro tanto* rule in CERCLA cases encourages early settlement, the allocation of private resources towards the hazardous waste disposal problem, and ultimately the expeditious cleanup of hazardous waste sites.  With the enactment of a parallel provision for a similarly situated government entity, the use of *pro tanto* distribution to encourage settlement is supported not only by policy but by statutory text. 42 U.S.C. § 9613(f)(2); *see also Akzo Nobel Coatings, Inc.* 197 F.3d at 308;  *Am. Cyanamid Co.* 381 F.3d at 21.

The final consideration in deciding between the *pro tanto* and proportionate rule is the effect on judicial economy.  Under either approach, the court must undertake some consideration of the equity of the settlment.  In the *pro tanto* approach this occurs at a post-settlement fairness hearing, conducted prior to trial.  Under the proportionate approach, a court must determine the relative culpability of all parties – including settling parties – and their equitable share at trial.  In the context of CERCLA, the assignment of liability to missing parties at trial will often be more time consuming and costly than the determination of fairness at a pre-trial hearing.  *Am. Cyanamid*, 381 F.3d at 20 ("[the proportionate approach] can lead to a complex and unproductive inquiry); *Akzo Nobel Coating*

197 F.3d at 308; *Action Manf'g Co., Inc.*, 428 F.Supp.2d at 327 ("the *pro tanto* approach may mean that a litigating defendant's liability will differ from it's equitable share, but it is easier to administer.") (internal quotations omitted).  In this case, the adoption of the *pro rata* approach is likely to save both the Court and the parties the burden and expense of a lengthy trial.  The Court has, in fact, already conducted a fairness hearing to review the settlement between Veolia and Marathon and, because the agreement is fair and reasonable, no additional time need be devoted to that proceeding.  GATX argues that even under the *pro tanto* rule the court will need to determine Marathon's liability at trial, because of the application of GATX's third party defense, under 42 U.S.C. § 9607(b)(3).  The Court has already held that this defense may be available to GATX, but that there are relevant factual issues to be determined at trial – including issues of Marathon's culpability and GATX's contractual relationship with Marathon.  To determine the applicability of the third party defense,  however, the Court would only have to resolve the question of *whether* Marathon bore *any* responsibility for this spill.  This is likely to be a much simpler determination than assigning Marathon a precise percentage of relative culpability.  As such, the *pro rata* approach is likely to result in a significant savings of time at trial.

For all of these reasons, the Court **FINDS** that *pro rata* settlement distribution is better approach in this case.   This accords with the findings of several other courts which addressed the issue.  While defendant GATX argues that the vast majority of courts have applied the proportionate rule, the Court finds this to be a gross overstatement, likely resulting from an outdated footnote in a single appellate court opinion.  Not only have district courts across the country applied the *pro tanto* rule, two of the three appellate courts to address the issue have approved of its use over the proportionate rule.  *Compare Akzo Nobel Coatings, Inc.* 197 F.3d 302 (applying the *pro tanto* rule);

-14-

and *Am. Cyanamid Co.*, 381 F.3d 6 (applying the *pro tanto* rule); *with Tosco Corp. v. Koch Industries, Inc.*, 216 F.3d 886 (10th Cir. 2000). In choosing to apply the proportionate rule the *Tosco Corp.* court relied heavily on its finding that "the majority of courts deciding contribution suits between private parties under 42 U.S.C. § 9613(f)(1). . . have applied the [proportionate rule] to reduce a nonsettling party's liability by the amount of the settling parties' liability not the settling amount." *Tosco Corp.* 216 F.3d at 897. For support, the court cited to a 1992 law review article – *Surveying the Superfund Settlement Dilemma*, 27 Land & Water L. Rev. 84, 109-12 & note 189. This article is now nearly 18 years old, and the legal landscape has changed. Moreover, both the *Akzo Nobel Coatings, Inc.* and *Am. Cyanamid Co.* courts have since engaged in a more thorough analysis of the competing settlement distribution rules and have reached the opposite conclusion.

## II.     The Settlement Between Veolia and Marathon is Fair and Reasonable.

The main purpose of the Court's February 23, 2010 hearing was to consider the fairness of the proposed settlement between Veolia and Marathon. As described in more detail above, the settlement agreement provides for a $200,000 Settlement Amount. Marathon can gain credit towards this sum for certain types of contracts it awards to Veolia in the future. If after three years there is less than $200,000 worth of credit, then Marathon must pay Veolia the remainder. The parties reached agreement in September 2009, nearly five years after the spill and after three full years of litigation.[2] The parties reached the settlement terms only after participating in mediation. The terms represent recovery by Veolia of roughly thirty percent of the total damages sought in this case.

---

[2]The case was filed in Kentucky in September of 2006 but was not transferred to this Court until March of 2007.

-15-

GATX and other defendants argue that the terms of the settlement are unfair to the nonsettling parties and are the result of a "sweetheart deal" by two entities with long-standing business relationships.  According to GATX, this agreement is part of a scheme to force innocent PRPs caught up in CERCLA's strict liability scheme to pay costs that Marathon should rightfully bear.  GATX contends that Veolia agreed to participate in this scheme in order to curry favor from Marathon and avoid losing lucrative business contracts from a well-heeled client.  As evidence of this scheme GATX points to the liability assignment from *John Adkins* in which the jury determined Marathon bore sixty percent culpability for its own actions and vicariously responsible for an additional percent as a result of Techsol's actions.  GATX questions why Veolia would settle for such a limited amount with an overwhelmingly culpable defendant if there was not some element of bad faith or collusion.

Veolia and Marathon each argue that the Settlement Agreement is fair on its face.  They contend that this was an arm's lengthy agreement between two sophisticated parties and as such should be honored by the Court.  They point out that the agreement was reached only after protracted and expensive litigation and mediation.  While GATX questions the settlement amount in terms of relative culpability, Veolia and Marathon rely on the fact that Marathon is one of five defendants in this case (three of which were seen as reasonable targets for recovery under CERCLA at the time of settlement) and settled for thirty percent of the total damages sought.

Although the Court has been unable to find guidance on a settlement fairness hearing under CERCLA, the statute was intended to embody "traditional and evolving principles" of common law. *U.S. v. Monsanto Co.,* 858 F.2d 160 (4th Cir. 1988).  As such, the Court may turn to state law for instruction.  The West Virginia Supreme Court has a well-developed body of case-law pertaining

to the evaluation of the good faith and fairness of settlement in the context of joint tortfeasors.[3]

As a general principle, the West Virginia Supreme Court cautions against judicial disruption of a settlement: "[e]xcept in rare cases of collusion or bad faith, . . . a joint tortfeasor should be permitted to negotiate settlement of an adverse claim according to his own best interests, whether for his financial advantage, or for the purchase of peace and quiet, or otherwise." *Cline v. White*, 393 S.E.2d 923, 926-27 (W.Va. 1990) (internal citations omitted). In West Virginia, "[s]ettlements are presumptively made in good faith." *Smith v. Monongahela Power Co.,* 429 S.E.2d 643, 651-52 (W.Va. 1993). The relevant inquiry should not focus "on whether the amount of the settlement accurately reflects the jury's ultimate apportionment of liability . . . . [T]he chief consideration is whether the settlement arrangement substantially impaired the remaining defendants from receiving a fair trial." *Bd. of Educ. of McDowell County v. Zando, Martin & Milstead, Inc.* 390 S.E.2d 796, 804-05 (W.Va. 1990). Keeping these basic principles in mind, the West Virginia courts have developed a multi-factor test for evaluating fairness:

> (1) the amount of the settlement in comparison to the potential liability of the settling tortfeasor *at the time of settlement,* in view of such considerations as as (a) a recognition that a torfeasor should pay less in settlement than after an unfavorable trial verdict, (b) the expense of litigation, (c) the probability that the plaintiff would win at trial, and (d) the insurance limits and solvency of all joint tortfeasors; (2) whether the settlement is supported by consideration; (3) whether the motivation of the settling plaintiff and settling tortfeasor to single out a non-settling defendant or defendants for wrongful tactical gain; and (4) whether there exists a relationship, such as

---

[3]In West Virginia distribution of settlement credit among joint tortfeasors follows the *pro tanto* rule. *See Bd. of Educ. of McDowell County v. Zando, Martin & Milstead, Inc.* 390 S.E.2d 796, 803-05 (W.Va. 1990)

family ties or an employer-employee relationship
naturally conducive to collusion.

*Smith* 429 S.E.2d at 652 (emphasis in original).

Considering the evidence in the record and representations by counsel at the fairness hearing, the Court must find, taking into account the principles and factors enunciated by the West Virginia Supreme Court, that the settlement between Veolia and Marathon is fair and was made in good faith. While the settlement value of $200,000 is certainly less than the responsibility assigned to Marathon in the *John Adkins* case, there are justifiable reasons for this discount. At the time of settlement Marathon was one of five remaining defendants, three of which Veolia would have predicted to fall within CERCLA's strict liability framework. Both parties are represented by zealous counsel, and this settlement was reached only after several years of intense litigation, in which Marathon was one of the leaders in generating motions and other court filings. Settlement, however, occurred months before the scheduled dispositive motion deadline and nearly six months before the scheduled trial – likely granting Veolia significant savings in trial costs. Moreover, while Veolia would have predicted Marathon to bear a substantial portion of culpability, to this date Marathon is the only party that has stepped forward to settle with the Plaintiff. The settlement itself is supported by consideration. While credit towards the $200,000 may be granted in return for the award of future contracts, either party bears the right to forgo credit and guarantee full cash payment. (Marathon would ensure monetary payment through the withholding of contracts, Veolia through a refusal to bid for work). While the remaining defendants are left on the hook for a significant amount of the damages, there does not appear to be unfair tactical gain of the type envisioned by the West Virginia

-18-

Supreme Court – that which would deny the remaining defendants a fair trial.[4] While Marathon and Veolia may have maintained a business relationship favorable to both parties, the Court cannot find that this is a relationship "naturally conducive to collusion" in the same way as an employer-employee relationship or that of family members. *See id.* Marathon, in fact, had a direct or indirect business relationship with nearly every party in this litigation and maintains a business relationship with GATX, Veolia, and possibly others. In short, the Court can find nothing to rebut the presumptive good faith of the settlement between Veolia and Marathon. The Court, therefore, **FINDS** that the settlement is fair and that it was made in good faith.

### III.   The Disputed $205,000 Sought by Veolia is Recoverable as a Necessary Response Cost Incurred by the Plaintiff of Which All Defendants Have Been on Notice Since the Onset of Litigation.

GATX claims that approximately $205,000 ($204,586.83 to be precise) of Veolia's claimed costs in this case should not be recoverable. This amount constitutes transportation and disposal fees incurred to dispose of material excavated during the period of October 28, 2004 through November 2, 2004. During those first four days of remediation, Veolia did not actually dispose of any material it was excavating, because contracts to do so were not yet in place. Instead, Veolia stored material on site until it found a suitable location for disposal. The physical transportation and disposal of material excavated from October 28, 2004 through November 2, 2004, did not take place until after November 2nd. The fees were not incurred until after November 2nd. GATX, Sloss and Rescar argue that this amount should not be recoverable in this action as Veolia stated in the complaint and

---

[4] The West Virginia Supreme Court noted in a footnote, "[u]nder the standards we set forth today, if a defendant attempts to overcome the presumption that a settlement is in good faith by showing that the settlors were motivated by wrongful tactical gain, he pulls an exceptionally heavy oar." *Smith*, 429 S.E.2d at 652 n. 13.

in responses to interrogatories that it was not seeking costs incurred after 4:30 p.m E.S.T. on November 2, 2004.

While it is true that Veolia did not have arrangements in place for disposal prior to November 2, 2004, no party disputes that the claimed costs were incurred solely for material excavated from October 2, 2004 through November 2, 2004 – the period of time for which Veolia has consistently sought response costs.  Moreover, the $204,586.83 for transportation and disposal fees was specifically itemized as a cost to be recovered in an exhibit to Veolia's first amended complaint.  As such, all defendants have been on notice since the beginning of this lawsuit that these costs were included in the total $640,127.50 in Veolia's claimed damages.  No one claims that the disputed amount is not a necessary response cost compensable under CERCLA, nor does any party claim that Veolia has already recovered these costs from an outside source.  Considering all of these facts, the Court **FINDS** that the disputed $204,586.83 sought by Veolia is recoverable in this action.  It is integrally related to the work performed from October 28, 2004 through November 2, 2004, and has been specifically delineated as part of the action from the very beginning.  To the extent it seeks to preclude Veolia from recovering this amount, GATX's motion for summary judgment is **DENIED**.

## CONCLUSION

For the reasons explained above, the Court **FINDS**: 1) that the *pro tanto* method is superior for settlement credit on the facts of this case; 2) that the proposed settlement between Plaintiff and Defendant Marathon Petroleum Company is fair and was reached in good faith; and, 3) that the disputed $205,000 in costs incurred by Veolia for transportation and disposal is recoverable.

As a result of these decisions the following motions have been resolved: (Doc. 279) GATX's Motion for Partial Summary Judgment Against Defendant Marathon is **DENIED** as moot; (Doc. 306) GATX's Motion *in Limine* with Respect to Application of CERCLA Settlement Credit Rules is **DENIED**; (Doc. 327) Defendant Marathon Petroleum Company LLC's Motion to Dismiss is **GRANTED;** (Doc. 367) Defendant Marathon Petroleum Company LLC's Motion for Protective Order is **DENIED** as moot; (Doc. 369) Defendant GATX Corporation's Motion to Compel Marathon to Respond to Discovery requests is **DENIED** as moot; and, (Doc. 359) Defendant GATX''s Motion for Summary Judgment is **DENIED in part.**

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:   March 12, 2010

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE